**PETROFF and EMPLOYERS MUTUAL LIABILITY INSURANCE COMPANY, etc., Plaintiffs, v. COMMERCIAL MOTOR FREIGHT, INC., Defendant.**

Common Pleas Court, Franklin County.

No. 195986. Decided January 13, 1960.

Sebastian, Fais & Durst, for Employers Mutual Liability Ins. Company.

Goslee & Dunlap, for Nick Petroff.

Allen Pretzman, for defendant.

## OPINION

By SATER, J.

This case is presented for consideration and determination of defendant's motion based on §2311.041 R. C., for a summary judgment on the pleadings, affidavits and four depositions, all of which presently constitute the file in this case. There was full compliance with the statute by defendant in the matter of serving copies of its motion on all counsel for plaintiffs along with copies of all accompanying briefs and affidavits. Such counsel further filed of record receipt and notice of such papers from defendant. Answer briefs were duly filed; and as added precaution, an entry approved by all counsel has been filed, waiving the hearing provided for early in paragraph B of §2311.041 R. C., and submitting the motion on the file as described and constituted above.

There are two plaintiffs and one defendant in this case. For the sake of brevity, and possible clarity, plaintiff Nick Petroff will be referred to herein as Petroff, plaintiff Employees Mutual Life Insurance Company as employees, and defendant Commercial Motor Freight, Inc., as Commercial.

At the time in question, February 28, 1956, Petroff was a road-haul truck driver, acting as such in the employ of Michigan Motor Freight Lines, Inc., a Michigan corporation which, under the laws of the State of Michigan, carried workmen's compensation on its employees not through the Michigan Industrial Commission but through Employers which paid sums as directed and found by that Commission. By reason of such payments Employers were automatically by Michigan statute subrogated pro tanto to the claim of any such employee so paid by it. Hence, in this case Petroff and Employers joined as co-plaintiffs as their respective interests may appear; and the propriety of such joinder has already been approved by this Court.

Late on the afternoon or early evening of February 27, 1956, Petroff picked up his rig consisting of a tractor, semi-trailer and trailer at

Ashland, Kentucky, and drove across the Ohio River to Ironton, Ohio, for his rig to be loaded with spools of rolled steel to be transported by him to Detroit, Michigan. While the loading was taking place, Petroff slept for three hours at Morentz, a truck drivers' stop-in. Somewhere around 11:00 P. M. he started his trip to Detroit; no definite time was set by Michigan Motor Freight Lines for his arrival in Detroit. One Harris, a companion driver, followed him with another load on a tractor-trailer unit. Both tractors had speed governors on them. On the trip via Portsmouth, Chillicothe, Circleville, Columbus and Marysville, Petroff was in the lead.

Between Portsmouth and Chillicothe, the two drivers ran into snow and ice (either pure ice or snow hard packed by vehicles). They stopped briefly at Chillicothe to clear ice from their windshields. Again they took off with Petroff in the lead, using S. R. 104 to Columbus because of its slighter volume of traffic; thence to Marysville and onward. The trip so far was uneventful. Petroff, age 30, and the father of a family, had had eleven years experience as a truck driver; in those eleven years he had had no serious accident and, as far as he can remember, had never received a traffic violation ticket.

In the lead, Petroff had no recollection of passing through Columbus or Marysville. In fact he has no recollection how on S. R. No. 31 some 13-14 miles north of Marysville, his rig collided with that of Commercial which was going in the opposite direction, south into Columbus with a cargo of miscellaneous freight. It seems to be essential to Commercial's defense to establish that Petroff's mind went blank, belike due to a serious head injury on Okinawa in 1946, somewhere north of Chillicothe where ice was removed from windshield, and remained so through Columbus, Marysville and the accident until he woke up in University Hospital in this city. It is, however, equally plausible to infer that the force of the collision drove all memory from his mind. His mind was certainly not a blank. He knew there was snow and ice from all the way south of Chillicothe; he knew his rig did not skid at any time, and he knew that there was nothing unusual about the trip at any time - - i. e., it was just another uneventful haul for him. He was obviously a skilled driver and had been over this run statedly many times. After all, vehicle operators do not usually drive in the expectation that they may or soon will be involved in a terrific collision. Nor since his discharge from the Marine Corps late in 1946 or early 1947 had he had any sickness, been hospitalized or seen a doctor except for common colds. On such a motion as is now before us for consideration, it is not the function or duty of the Court to reconcile ambiguities or conflicts in a witness' testimony. Tinker v. N. W. Airlines (Ohio), 10 F. R. D., 372, Furton v. City of Menasha, (Wisc.), 149 Fed. 2d, 945, Coe v. Riley (Fla.), 160 Fed. 2d, 538, 540.

Commercial's rig, driven by Cecil Gordon, who had been over that road "maybe a dozen times," was coming south over S. R. No. 21, headed for Columbus. He knew that there were patches of ice and snow on S. R. No. 3 all the way from Kenton at least 30 miles to the north. About 1000 feet north of the spot where the collision occurred, the road swung to the east in a long, smooth curve. Thus Gordon was on the

outside of that curve and his headlights would be directed substantially to the left of Petroff; on the other hand, Petroff's lights on the inside of the curve would be almost directly in Gordon's eyes. Where the vehicles collided, the road was straight, level, macadam, 20 feet wide, with a substantial berm on each side. One wonders how wide is the over-the-road rig of a regulated motor carrier; certainly not over ten feet.

Gordon saw Petroff approaching, hugging the center of the road with his left wheels, but nowhere in his deposition would he say that any part of Petroff's rig was to the left of the center of the highway; indeed, he expressly refused therein to say so. He slowed down from 30-35 miles per hour as the vehicles approached, to 15 miles per hour, and pulled as far as he could onto the berm of the road on his right without going into the ditch on the right (west). Again, one wonders why this maneuver was necessary in view of the width of the highway and of the certain fact of him who was there that Petroff had left him at least 10 feet of macadam to drive past on.

As the vehicles approached each other, the semi-trailer on Gordon's Commercial rig started to slide or "jack-knife" - - a phrase which in motor carrier jargon means that the semi-trailer slides at an angle from the direction being taken by the power tractor unit; the jack-knifing may leave the rig in the shape of a capital L, or even V. Conceivably this can be caused by slippery road, by too sudden application of the brakes, or both; or, conceivably from pulling over part way onto the berm so that motive power was greater on the inside than on the outside wheels. Gordon does not know whether the rear end of Commercial's rig so jack-knifed over until part of it was on the east or Petroff's side of the highway (but in view of his refusal to say that any part of Petroff's rig crossed the center of the highway as it approached, the inference is obvious).

In any event, at about 3:15 A. M. on February 28, 1956, the two rigs collided while Commercial's rig was still jack-knifing. Petroff's tractor hit the left rear of the Commercial rig. Each driver, Petroff and Gordon, was alone. So far no eye-witness has been found. When it was over, Highway Patrolman Wurm testified that two hours later, when he arrived, the two rigs were 170-190 feet apart, Petroff headed mostly easterly with its trailer still on the road, Commercial off the highway headed mostly to the south. (Let it be noted in passing that if Gordon's estimate of 1½ truck lengths between the two rigs, and the directions in which they were headed was no more accurate than his estimate of his own speed, he was in all likelihood travelling a great deal more than his 15 miles per hour.) Petroff has not been able to work since. The steel rolls on Petroff's rig lay about the east side of the road; Commercial's freight lay "on the west side of the road and center part—all parts of the road." Neither rig upset. There was so much debris on the highway that Wurm could not state the point of impact on the highway. The left side of Petroff's tractor was demolished and there was some damage to the left side of the semi-trailer; about ten feet had been torn off the rear of Commercial's semi-trailer rig. Wurm further testified that there was a 38 foot long mark left

apparently by Commercial's right front wheel until it reached a point seven feet off on the berm on the west side of the highway; but since he could not locate the point of impact, it is guesswork whether this line was in front of or following the point of impact, whether it resulted from Gordon's swerving or from his application of brakes, yet, again, it causes wonder why Gordon did not drive straight by—and what effort, if any, he made to pull Commercial's rig out of its jack-knifing.

This narration of facts, so far uncontroverted, leaves many questions of fact which only more evidence (e. g., Michigan Motor Freight's second driver has not yet testified) and a jury can decide. Was there an icy patch at the point of impact? Did it cover the whole highway? Which driver hit it first? Did either or neither hit it? Was Petroff's hugging the center of the highway on his side the proximate cause? Or was Commercial's jack-knifing? Or both, or' neither? Why did Commercial's rig jack-knife at all? Did Commercial's semi-trailer get over onto the east (wrong) side of the highway? How fast was each of the two rigs travelling under adverse weather conditions? Legally, at least, §§4511.20, 4511.21 and 4511.29 R. C., are probably all involved in this case. There is sharp conflict as to all operative facts except the generalities of incorporation, agency, date, place and hour of the collision. The need for jury trial is incontrovertible.

Petroff and Employers joined as plaintiffs in an action against Commercial. Their second amended petition sets up the following acts of negligence by Commercial: (1) operating at a speed greater than was reasonable and proper, namely, 40 miles per hour, (2) operating to the left of center of the highway and failing to operate on the right (west) side of the highway, (3) driving out of the line of traffic without ascertaining that it could be safely done, (4) failure to keep its vehicle under control. There is also quoted the Michigan statute authorizing partial subrogation. Commercial's answer sets up four defenses: (1) denial of all except Employer's incorporation, route, date, directions, time and place of collision, denies extent of Petroff's injuries, alleges contributory negligence, (2) misjoinder of Petroff and Employers as co-parties plaintiff, (3) misjoinder of causes of action in Petroff and Employers in one petition, (4) no cause of action stated as to Employers. These pleadings were filed February 13, 1958, and April 2, 1959, respectively. The motion for summary judgment was filed December 31, 1959.

Our Summary Judgment Statute, §2311.041 R. C., became effective November 9, 1959. We know of no reported case in Ohio construing it. However, Commercial's brief agrees that this Ohio statute is parallel and closely akin to Federal Rule of Civil Procedure, No. 56; that is, both logical and accurate.

A great many authorities, state and federal, can be found in 28 U. S. C. A., "Federal Rules of Civil Procedure," No. 56, notes 4, 5, 6, 7, 8, 9, 22, 23, 55, 59, 60. The purpose of such a rule or statute is to terminate useless and expensive litigation when there is no general issue as to any material fact. Creel v. Lone Star Defense Corp. (Texas), 171 Fed. 2d, 964, Lincoln Electric Co. v. Knox (D. C.), 56 Fed. Supp., 308, 310, Rogers v. Girard Trust Co. (Ohio), 159 Fed. 2d, 239, 241, and Bowdidge v. Lehman, post. (Ohio), 252 Fed. 2d, 366. It is to be used where issues are feigned,

438

and there is really nothing to try. Nat'l. Transformer Co. v. Ranney (Ohio), 86 Fed. Supp., 57, 58. It is a remedy that is to be used with caution. Assn. Press et al., v. U. S., 326 U. S., 1, 6, 89 L. ed., 2013, 2022. By statutory wording as well as court decision, all doubts are to be resolved against movant. Latsko v. Nat'l Carloading Co. (Ohio), 192 Fed. 2d, 905. If there is the slightest doubt as to the facts, the motion does not lie. Dazian's v. Switzer Bros. (Ohio), 111 Fed. Supp., 648, 649, Plethaty Co. v. Heckett Engineering, Inc. (Ohio), 145 Fed. Supp., 805, 807. It is not intended to block cross examination of a defendant, especially when the facts are particularly within his knowledge. Arnstein v. Porter (N. Y.), 154 Fed. 2d, 464, Bluffs Creek Oil Co. v. Green (Texas), 257 Fed. 2d, 83, 87-88. Such a motion may be granted only if there is no dispute as to any material fact. Fountain v. Filson, 336 U. S., 681, 683, 93 L. ed., 971, 973, Green Bay Auto Distrib. v. Willys-Overland (Ohio), 102 Fed. Supp., 151. There are here issues of fact that must be left for the jury to decide. Union Carbide Co. v. Hicks Express Co. (Del.), 162 Fed. Supp., 612, 613. Jacob v. Penna, R. R. (Ohio), 203 Fed. 2d, 290, Bowdidge v. Lehman (Ohio), 252 Fed. 2d, 366, 368. Shaffer v. U. S. (Ohio), 216 Fed. 2d, 330. For a more comprehensive discussion of comparable state statutes in particular, see 41 Am. Jur., 525, Sec. 342, par. 1. The facts presently confronting us clearly remove this case from the category of litigation at which this new Ohio statute is directed. It may perhaps not be said that the motion was filed here by the wrong party, but the pleadings, affidavits and four depositions indicate beyond doubt that this is properly a jury case.

Motion for summary judgment overruled. Exceptions to Commercial.